Philip Stein and Kathryne Stein v. Commissioner.
Stein v. Commissioner
Docket No. 80088.
United States Tax Court
T.C. Memo 1962-19; 1962 Tax Ct. Memo LEXIS 290; 21 T.C.M. (CCH) 86; T.C.M. (RIA) 62019; January 30, 1962
Henry Klepak, Esq., Mercantile Bank Bldg., Dallas, Tex. for the petitioners. David E. Mills, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent has determined deficiencies in the income tax of petitioners and additions to tax for the years *291 and in the amounts as follows: Additions to Tax
Sec.
Sec. 294
Sec.
293(a)
(d)(1)(B)
6653(a)
I.R.C.
I.R.C.
I.R.C.
Year
Deficiency
1939
1939
1954
1952
$17,640.78
$882.04
1953
12,832.58
641.63
$78.00
1954
1,141.93
$57.09
The issues presented for our decision are the correctness of the respondent's action in determining: (1) that petitioners understated their income from wagering operations during 1952, 1953, and 1954 by the exclusion of amounts claimed as gambling losses; (2) that petitioners are liable for additions to tax for negligence for 1952, 1953, and 1954 under section 293(a) of the Internal Revenue Code of 1939 and section 6653(a) of the Internal Revenue Code of 1954; and (3) that petitioners are liable for an addition to tax for failure to make payment of an installment of estimated tax for 1953 under section 294(d)(1)(B) of the 1939 Code. General Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife residing at Dallas, Texas. They filed their joint income tax returns for 1952, 1953, and 1954 with the director *292 at Dallas. Inasmuch as the activities of Philip Stein are those with which we are here primarily concerned, "petitioner" or "Stein" as hereinafter used has reference to him. Issue 1. Unreported Income from Wagering Findings of Fact Philip Stein was a professional gambler during the years here involved. He engaged in a variety of gambing activities, including playing poker and gin rummy, shooting dice, and betting on sports events, particularly football games, basketball games, golf tournaments, and prize fights. He travelled extensively during 1952, 1953, and 1954, particularly in the far western states, and engaged in gambling in various cities where he stayed for short periods. Stein occasionally visited gambling casinos in Reno and Las Vegas, Nevada, where he engaged in wagering. He also attended conventions of various kinds in different cities where he conducted gambling activities in his hotel room. He did not engage in bookmaking and did not operate a gambling establishment of any kind. Petitioner gambled individually throughout the years in issue and during 1952 he also gambled with a partner, George Rechenberg. The persons with whom Stein made wagers were usually unknown *293 to him, and he did not obtain receipts from any of his bettors. He constantly carried a roll of cash in his pocket for use in his individual wagering. During 1952, he occasionally carried a second bankroll for the joint use of himself and Rechenberg. He also carried cash for the payment of his personal living expenses and for the purchase of food and drinks for those with whom he gambled. If petitioner found his personal funds to be inadequate to take care of his living expenses he made it his practice to withdraw the needed cash from his gambling bankroll and insert a slip of paper in its place showing the amount withdrawn. During the years here in issue he began each day's gambling activities with whatever cash he thought he would need to carry for betting purposes. He made no record of these amounts. He counted his cash roll at the end of each day and if he had more currency than the amount he could remember having begun the day with, he concluded he had realized a net win for the day; if he had less, he concluded he had realized a loss for the day. During 1952, 1953, and 1954 Stein followed the practice of recording at the end of each day an amount purporting to represent his *294 net gain or loss for the day from gambling transactions. He recorded these amounts (preceded by a "W" or "L") on any scrap of paper he could find handy such as a match folder, scrap of note paper, cocktail napkin, scratch pad, soap wrapper, postcard, score card, gin rummy slip, etc. He kept these various slips of paper in his pocket until he returned home where he placed them in a drawer and retained them until the end of the year. After the close of each of the years in issue he collected all these scraps of paper containing dated entries preceded by a "W" or "L" and copied the entries in a small notebook. He afterwards destroyed the various pieces of paper (with the exception of those for 1952) which he had saved throughout each year. In addition to the various scratch notations, petitioner's records consisted of four small notebooks which were prepared after the close of each of the years in issue. These notebooks did not contain original entries but disclosed a running balance interspersed with dated entries which purport to show winnings (listed as "in") and losses (recorded as "out") for 1952, 1953, and 1954 followed by an arithmetical computation. Philip Stein did not keep *295 regular, verifiable, and adequate records of his wagering transactions for the years here involved. Petitioners reported income from the individual gambling of Philip Stein on their joint income tax returns for 1952, 1953, and 1954 in the amounts of $11,269.74, $9,561, and $4,694, respectively. Each of these amounts is identical with the last figure appearing in each of petitioner's notebooks for those years. On their joint income tax return for 1952, petitioners also reported $6,650 as income from Stein's partnership with George Rechenberg. This amount represents approximately one-half the last figure shown in one of petitioner's two notebooks for 1952. [1]
The respondent has computed the total amount listed in each of petitioner's notebooks as "out" (indicating * claimed wagering losses) for each of the years in issue, and has added this annual total to his reported income for that year. Respondent has thereby determined that petitioner realized additional income from individual gambling for 1952, 1953, and 1954 in the amounts of $22,677, $29,802, and $3,932, respectively. He also determined that petitioner *296 realized additional income from his gambling partnership in 1952 in the amount of $11,352.50. Ultimate Finding Petitioner did not realize wagering losses during 1952, 1953, and 1954 in amounts greater than those allowed by the respondent. Opinion Respondent has taken the position that petitioners have failed to substantiate the exclusion of any of the amounts subtracted by them as gambling losses in computing their income from wagering for the years 1952, 1953, and 1954. Petitioners contend that Stein maintained sufficient records of his wagering losses during the years in issue and that he is entitled to subtract all of the amounts shown as losses in the series of entries listed in the notebooks for each of the years involved. It is incumbent upon petitioners to establish by competent evidence the losses claimed by them in the amounts thereof. Reinecke v. Spalding, 280 U.S. 227; Botany Mills v. United States, 278 U.S. 282. *297 To sustain that burden petitioners rely entirely upon the notebooks and the testimony of Philip Stein. Petitioner explained to the Court in considerable detail the type of gambling activities in which he was engaged during the years in issue, and his method of conducting his gambling operations. Stein testified that throughout the years in issue he consistently carried one bankroll of wagering cash for use in his individual gambling and during 1952, he occasionally carried a second bankroll for the joint use of himself and his gambling partner, George Rechenberg. He stated that when he carried two bankrolls he kept each one in a separate pocket. He also testified that he carried in a separate pocket sufficient cash to take care of his personal living expenses. He stated that in the event his personal funds were insufficient to take care of his expenses he would withdraw the necessary currency from his gambling bankroll and insert in its place a slip of paper showing the amount withdrawn. Petitioner further testified that it was his practice during the years here involved to begin each day's gambling activities with whatever cash he thought he would need to carry for wagering purposes. *298 He made no record of these amounts. At the end of each day he counted his cash roll. If he had more cash than the amount he could recall having begun the day with, he concluded he had had a winning day; if he had less, he concluded he had realized a loss for the day. Stein declared that throughout the years in issue he followed the practice of recording at the end of each day his gain or loss for the day from gambling transactions (measured by the daily increase or decrease in his bankroll) on any slip of paper he could find handy, viz., a cocktail napkin, a match folder, a scrap of note paper, scratch pad, soap wrapper, postcard, score card, gin rummy slip, etc. A box containing more than 80 such slips of paper upon which, according to petitioner's testimony, he recorded his individual daily net gambling win or loss during 1952, was introduced in evidence as Exhibit 12. The following is illustrative of the notations written on each of these memoranda: Sept. 4
52 [2]
W
321
Petitioner explained that he kept in his pocket the various memoranda of net daily wins and losses until *299 he returned home and placed them in a drawer where they were saved until the end of the year. He stated that after the close of each of the years in issue he gathered all the scraps of paper containing notations purporting to represent his daily net gains and losses and copied the entries into a small notebook (e.g., Exhibit 10, 11, 13, or 14). [3] He then destroyed the various pieces of paper containing daily notations (with the exception of those for 1952) which he had saved throughout each year. Each entry in the notebooks prepared by Stein for the years involved is followed by an arithmetical computation which he explained discloses the daily increase or decrease in the bankroll with which he began the year. The following entries from one of these notebooks (Ex. 11) illustrates the type of entries and computations contained in Exhibits *300 10, 11, 13, and 14: March 24
March 31
3,650
3,095
out 555
in 1,288
3,095
4,383 All of the entries in each of these notebooks for 1952, 1953, and 1954 were made by petitioner with a lead pencil. The entries listed in Stein's individual gambling notebook for 1952 (Exhibit 11) correspond almost exactly to the amounts shown as notations on the numerous memoranda (match folders, cocktail napkins, gin rummy slips, etc.) contained in Exhibit 12. [4]
*301 Every taxpayer is required to maintain and preserve complete and accurate records which will disclose to the respondent the amount of his income and expenses for the taxable year. Section 54(a), I.R.C. 1939; [5]section 6001, I.R.C. 1954; [6]section 19.54-1, Regs. 103; [7]section 1.6001-1(a) and (e), Income Tax Regs.[8]Dorothy L. Sutherland, 32 T.C. 862. *302 Are the meager records here in question sufficiently complete and verifiable to qualify as adequate books of account under the requirements of the statutes, the case law, and the respondent's regulations? We do not think so. For the years 1953 and 1954 petitioner's records consist only of the notebooks (Exhibits 13 and 14). According to his testimony, these were prepared by him after the close of each of those years. They do not reflect any of his gambling transactions and they do not disclose the identity of any of his bettors. The data from which these notebooks were prepared have been destroyed by petitioner. It is absolutely impossible for the Commissioner or this Court to verify any of the amounts listed therein. Stein did not testify to having independent recollection of any specific gambling transaction or of any particular amount of money he won or lost. His testimony is only that he recorded the chronological listings "in" and "out" accurately from slips of paper which since have been destroyed. Because of certain contradictions between his statements at the trial and some of the answers he gave under oath to the respondent, the testimony of petitioner is not entirely beyond *303 suspicion. A mere summary record of income and expenses prepared at the end of the year rather than during the normal course of a taxpayer's business, or a condensed record made during the course of business but unsupported by records of original entry is inadequate for tax purposes. Meyer J. Safra, 30 T.C. 1026; Jack Showell, 23 T.C. 495, remanded 238 F. 2d 148; Nellis v. Commissioner, 232 F. 2d 890, affirming per curiam a Memorandum Opinion of this Court. We cannot here permit petitioner to destroy his basic records and then utilize these summary notebooks in an effort "to hide behind an impenetrable wall." Anthony Delsanter, 28 T.C. 845, 857, affd. 267 F. 2d 39. Federal National Bank of Shawnee, 16 T.C. 54, petition for review dismissed 191 F. 2d 402. With respect to the year 1952 Stein declared that his records consist of two notebooks (Exhibits 10 and 11), one of which, according to his explanation, reflected his individual gambling activities, and the other his partnership *304 gambling with George Rechenberg plus the box of scratch notations introduced as Exhibit 12. As previously noted, the amounts written on the pieces of paper contained in Exhibit 12 and the entries listed chronologically in Exhibit 11, petitioner's year-end summary of his individual gambling gains and losses for 1952, closely correspond. However, the mere fact that the figures written on the two sets of entries can be matched, or that one was copied from the other, adds nothing to the stature of either set if in itself it is an unverifiable record of income and losses. See Sam Mesi, 25 T.C. 513, 514, revd. on other grounds 242 F. 2d 558, affd. on other grounds sub nom. Commissioner v. Sullivan, 356 U.S. 27. Although petitioner consistently made daily entries on various scraps of paper during 1952, such records nevertheless are subject to serious defects. These daily entries do not reflect a single gambling transaction. They fail to identify even one individual with whom Stein made a wager during 1952. They do not disclose either the number or the nature of the transactions in which petitioner participated on any given day, or the amount won *305 or lost in any of them. They do not show the amount of wagering cash with which he began a single day's activities, or the amount of cash he had left at the end of any particular day. Stein explained that after he had "built up" the amount of cash in his partnership bankroll during 1952 he withdrew some of it. How much he withdrew and when we are not told. Petitioner testified that whenever he withdrew cash from either of his gambling bankrolls he replaced it with a slip of paper showing the amount withdrawn, but he acknowledged that if he had forgotten to insert such a slip, or if the slip was lost, such a withdrawal would show up as a gambling loss when he counted his cash at the end of the day. He also stated that whenever the need arose, he would transfer cash from his individual bankroll to his partnership bankroll, and vice versa. It is therefore apparent that the entries written on various scraps of paper during 1952 are entirely dependent upon petitioner's memory at the end of the day, his caution in handling withdrawals and transfers of cash from his bankrolls, his consistency in making notations of such withdrawals and retaining the slips, and his reliability in accurately *306 recording, without the use of any receipt or written notation, the net result of his gambling transactions for the day. His system of record keeping was easily susceptible of error and intentional manipulation. He maintained no account whatever of the amounts received in gambling transactions, or of the sums paid out to winning bettors. There is no possible means whereby the respondent or this Court are able to check any of the amounts noted on the various scraps of paper contained in Exhibit 12. Stein did not claim that he had any independent recollection of any of the amounts recorded on these scratch notations. Consequently, these slips of paper are valueless as accurate records of his gambling winnings and losses for 1952. The two notebooks for 1952 were prepared after the close of the year, and are not supported by any adequate record of original entry. Thus, these summary notebooks are no more sufficient as books of record than those for 1953 and 1954 heretofore mentioned. Consequently, petitioner has failed by competent evidence to establish that he suffered gambling losses during the years in issue in an amount greater than determined by respondent. If this were a case *307 in which the taxpayer had demonstrated that he in fact realized gambling losses in excess of those already allowed by the respondent, [9] and the amount of such additional losses was indefinite, we would be authorized under Cohan v. Commissioner, 39 F. 2d 540, to allow him a further loss deduction in an approximate or estimated amount based upon the entire record. But since petitioner has failed to meet his burden of proving that he actually realized any additional wagering losses, Cohan v. Commissioner, supra, has no application here. *308 Therefore, in the absence of satisfactory proof to the contrary, we hold that respondent's determination of unreported income from wagering to the extent of petitioner's recorded net daily losses, must be sustained. Issue 2. Additions to Tax for Negligence Opinion The respondent has determined additions to tax for negligence for 1952, 1953, and 1954 under section 293(a) of the 1939 Code and section 6653(a) of the 1954 Code. Apart from the testimony of Philip Stein and the notebooks and box of notations introduced by him which we have discussed in detail under Issue 1, supra, petitioners have offered no evidence with respect to this issue. As we view the record herein, petitioner's failure to keep adequate records showing his income and losses from wagering for the years in issue was due both in fact and in law to negligence on his part and to his intentional disregard of the respondent's regulations. Respondent's determination of additions to tax on the ground that a part of the deficiencies in tax for the years in question was due to negligence and intentional disregard of rules and regulations must be sustained. Issue 3. Addition to Tax for Failure to Pay Timely Installment
*309 Findings of Fact On March 14, 1953, petitioners filed a declaration of estimated tax for 1953 with the director at Dallas, Texas, showing an estimated income tax liability of $400. They paid $100 of their estimated tax at the time they filed their declaration. Subsequently petitioners were billed for the periods ending June 15, 1953, and September 15, 1953, for installments of estimated tax due. On January 18, 1954, petitioners filed an amended declaration of estimated tax for 1953 showing estimated tax liability in the amount of $1,600. They also submitted a check at that time (dated January 15, 1954) issued by Philip Stein for $1,300 drawn upon the National City Bank of Dallas and made payable to the director of internal revenue. At the time Stein wrote this check and mailed it to the director he knew his account balance in the National City Bank was not sufficient to cover a withdrawal of $1,300. The check was dishonored by the bank for insufficient funds and was returned by the director to petitioners. Respondent has determined an addition to tax for failure to pay an installment of estimated tax for 1953, under section 291(d)(1)(B) of the 1939 Code. Opinion Petitioners *310 were required to pay their final installment of estimated tax for 1953 not later than January 15, 1954, under sections 59(a)(1) and (b) of the 1939 Code. [10] With full knowledge that they lacked sufficient funds to pay their final installment of estimated tax due for 1953, they issued a bad check to the director of internal revenue in purported payment of that installment. Stein testified that when he wrote the check dated January 15, 1954, for $1,300, he thought he would be able to obtain additional funds to deposit in his account before the check was returned, but was unsuccessful. He also stated that he subsequently paid his final installment of estimated tax for 1953 in the amount of $1,300. But the record is completely silent as to the time he made such payment. *311 Petitioner's final installment of their estimated tax for 1953 was prescribed by statute to be due on January 15, 1954, and their failure to pay it by that date was not shown by them to have been due to reasonable cause "under section 294(d)(1)(B) of the 1939 Code. [11] We accordingly hold that they are liable for an addition to tax under that section for failure to pay the installment of estimated tax within the time prescribed. *312 Decision will be entered for the respondent. Footnotes
1. The last figure appearing in the notebook (Exhibit 10) is $13,330.↩
*. The word "including" was deleted and the word "indicating" was added by an official order of the Tax Court dated February 1, 1962 and signed by Judge Withey↩.
2. This entry appears to have been made with a ballpoint pen on a cocktail napkin.↩
3. Petitioner testified that three of these notebooks (Exhibits 11, 13, and 14) represented a running summary of his individual gambling winnings and losses for 1952, 1953, and 1954. One notebook (Exhibit 10), according to his explanation, contains a running account of the partnership winnings and losses of himself and Rechenberg for 1952.↩
4. By our count, there are 83 dated entries in petitioner's notebook for 1952 (Exhibit 11), listed chronologically. We also counted 83 separate pieces of paper containing notations of amounts preceded by "W" or "L" together with various dates in 1952 (Exhibit 12). We discovered only two discrepancies between the two separate sets of entries in Exhibits 11 and 12: (1) Exhibit 12 contains duplicate notations as to one day: "Oct. 6-52. L 1,315," one of which was made on a match folder and the other on a cocktail napkin; (2) we are unable, by our examination of Exhibit 12, to find any notation of the amount entered in the notebook as the net daily win ( $700) for August 1, 1952. Otherwise, the amounts appearing in the two sets of dated entries for 1952 match perfectly.↩
5. I.R.C. 1939. SEC. 54. RECORDS AND SPECIAL RETURNS. (a) By Taxpayer. - Every person liable to any tax imposed by this chapter or for the collection thereof, shall keep such records, render under oath such statements, make such returns, and comply with such rules and regulations, as the Commissioner, with the approval of the Secretary, may from time to time prescribe. ↩
6. I.R.C. 1954. SEC. 6001. NOTICE OR REGULATIONS REQUIRING RECORDS, STATEMENTS, AND SPECIAL RETURNS. Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary or his delegate may from time to time prescribe. Whenever in the judgment of the Secretary or his delegate it is necessary, he may require any person, by notice served upon such person or by regulations, to make such returns, render such statements, or keep such records, as the Secretary or his delegate deems sufficient to show whether or not such person is liable for tax under this title. ↩
7. REGS. 103. Sec. 19.54-1↩. Records and income tax forms. - Every person subject to the tax, except persons whose gross income (1) consists solely of salary, wages, or similar compensation for personal services rendered, or (2) arises solely from the business of growing and selling products of the soil, shall, for the purpose of enabling the Commissioner to determine the correct amount of income subject to the tax, keep such permanent books of account, or records, including inventories, as are sufficient to establish the amount of the gross income and the deductions, credits, and other matters required to be shown in any return under chapter 1. Such books or records shall be kept at all times available for inspection by internal-revenue officers, and shall be retained so long as the contents thereof may become material in the administration of any internal-revenue law. 8. Income Tax Regs. § 1.6001 Statutory provisions; notice or regulations requiring records, statements, and special returns. * * *
§ 1.6001-1 Records. (a) In general. Except as provided in paragraph (b) of this section, any person subject to tax under subtitle A of the Code, or any person required to file a return of information with respect to income, shall keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information. * * *
(e) Retention of records. The books or records required by this section shall be kept at all times available for inspection by authorized internal revenue officers or employees, and shall be retained so long as the contents thereof may become material in the administration of any internal revenue law.↩
9. Respondent's determination does not disallow all of petitioner's claimed wagering losses during 1952, 1953, and 1954. With respect to the dated entries in Stein's notebooks showing "in" or a net win for the day, respondent has already allowed petitioner to subtract all the losses he claimed on those days. As to entries marked "out," or shown as a net wagering loss for the day, respondent has allowed petitioner the deduction of claimed losses to the extent of claimed winnings, and has disallowed and added to reported income only those recorded daily losses which appear in his notebooks to be in excess of his daily winnings.↩
10. SEC. 59. PAYMENT OF ESTIMATED TAX. (a) In General. - The estimated tax shall be paid as follows: (1) If the declaration is filed on or before March 15 of the taxable year, the estimated tax shall be paid in four equal installments. The first installment shall be paid at the time of the filing of the declaration, the second and third on June 15 and September 15, respectively, of the taxable year, and the fourth on January 15 of the succeeding taxable year. * * *
(b) Amendments of Declaration. - If any amendment of a declaration is filed, the remaining installments, if any, shall be ratably increased or decreased, as the case may be, to reflect the increase or decrease, as the case may be, in the estimated tax by reason of such amendment, and if any amendment is made after September 15 of the taxable year, any increase in the estimated tax by reason thereof shall be paid at the time of making such amendment.↩
11. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * *
(d) Estimated Tax. - (1) Failure to File Declaration or Pay Installment of Estimated Tax. * * *
(B) Failure to Pay Installments of Estimated Tax Declared. - Where a declaration of estimated tax has been made and filed within the time prescribed, or where a declaration of estimated tax has been made and filed after the time prescribed and the Commissioner has found that failure to make and file such declaration within the time prescribed was due to reasonable cause and not to willful neglect, in the case of a failure to pay an installment of the estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of the unpaid amount of such installment, and in addition 1 per centum of such unpaid amount for each month (except the first) or fraction thereof during which such amount remains unpaid. In no event shall the aggregate addition to the tax under this subparagraph with respect to any installment due but unpaid, exceed 10 per centum of the unpaid portion of such installment.↩